J-S53008-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARCUS  JONES | : | |
| | : | |
| Appellant | : | No. 3020 EDA 2017 |

Appeal from the Judgment of Sentence August 21, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0001100-2016

BEFORE:  OLSON, J., STABILE, J., and NICHOLS, J.

MEMORANDUM BY OLSON, J.:                          **FILED NOVEMBER 13, 2019**

Appellant, Marcus Jones, appeals from the judgment of sentence entered on August 21, 2017, following his bench trial convictions for attempted murder, aggravated assault, robbery, and theft by unlawful taking.[1]   Upon review, we affirm.

The trial court summarized the facts of this case as follows:

> On August 18, 2015, around 1[:00] p.m., Appellant brutally assaulted [a transgender person (a biological male who identified as a female)] on the 900 block of North Watts Street in the city and county of Philadelphia, Pennsylvania.  The assault was recorded by a video camera mounted to a nearby wall.  The video shows that Appellant punched the victim until she was unconscious and then repeatedly stomped on her head.

Trial Court Opinion, 8/7/2018, at 2 (footnotes and record citations omitted).

---

[1] 18 Pa.C.S.A. §§ 2502/901, 2702(a)(1), 3701(a)(1)(i), and 3921(a), respectively.

Thereafter,

Officer [Patrick] Saba [of the Philadelphia Police Department] was on patrol and received a radio call regarding an assault at 900 North Watts Street. Officer Saba responded to the location within three (3) to four (4) minutes and discovered the victim laying on the ground between two sets of exterior steps. Officer Saba initially thought the victim was a woman because "there was a wig … by the top of the head," but upon approaching he observed male genitalia "sticking out of" the victim's jeans. The victim was unconscious and had "extremely swollen" eyes. Her "left eyelid was slightly hanging off" and she bled profusely from her face. Emergency responders arrived shortly after Officer Saba and transported the victim to Hahnemann Hospital.

[… T]he victim was unconscious for about two and one-half (2 ½) weeks following the assault and remained hospitalized for about one (1) month. After her hospitalization, the victim was taken to Moss Rehabilitation and then to Hopkins Nursing Home, where she resided at the time of trial. [… T]he victim is "wheelchair bound," has not "been able to walk since the day of the accident," now functions as a 16[-] or 17[-]year[-]old, and can no longer care for herself.

[…] Benjamin Levin (Mr. Levin), [] "a forensic scientist and [] expert [] in the field of DNA processing and analysis[,]" [] analyzed DNA taken from the inside of the victim's wig and dentures, as well as DNA taken from Appellant's bloody shoe. The DNA recovered from Appellant's bloody shoe was consistent with the DNA recovered from the victim's wig and dentures, and the DNA recovered from the victim's dentures was consistent with Appellant's DNA profile.

*Id.* at 6-7 (record citations omitted).

The trial court also recounted:

[On] August 19, 2015, Detective Ralph Domenic ("Detective Domenic") and his partner, Detective Waring, searched the crime scene for evidence and visited a homeless shelter about one block from where the assault occurred. There, a civilian, James Holloman ("Mr. Holloman") told them Appellant was "around the corner." Based on information received from Mr. Holloman, the

- 2 -

detectives arrested Appellant about one block from the homeless shelter.

The detectives transported Appellant to [the police station] and read him his ***Miranda***[2] rights. Appellant thereafter waived his ***Miranda*** rights and consented to an interview, during which he confessed to assaulting and robbing the victim during a sexual encounter [after Appellant realized the victim had male genitalia].

***Id.*** at 2.

Prior to trial, Appellant filed a motion to suppress his statements to police, arguing that he did not make them voluntarily or intelligently. More specifically, Appellant argued that he suffered from mental illness and lacked the intellectual capacity to understand the rights he was waiving. On May 8, 2017, the trial court held a suppression hearing immediately prior to holding a bench trial. Therein, the Commonwealth presented the report of Dr. Jillian Blair, who conducted a mental health evaluation of Appellant on February 17, 2017. N.T., 5/8/2017, at 48. Dr. Blair opined that although Appellant had an intelligence quotient (IQ) of 69, he presented as having "borderline intellect" rather than "moderate mental retardation." ***Id.*** at 76. Dr. Blair opined that Appellant was lucid, did not display psychotic symptoms, communicated adequately, answered questions directly and with detail, was able to appreciate his legal rights, and had the cognitive ability to work with his attorney to prepare his defense. ***Id.*** at 57.

---

[2] ***Miranda v. Arizona***, 384 U.S. 436, 86 S.Ct. 1602 (1966).

- 3 -

Moreover, the Commonwealth presented the testimony of Detective Ralph Domenic, who interviewed Appellant at the police station. The trial court summarized Detective Domenic's testimony as follows:

> At the suppression hearing, Detective Domenic testified that Appellant signed [an acknowledgment that he received] ***Miranda*** warnings after having twice reviewed them; that Appellant had no questions regarding the warnings; that Appellant never requested to speak to a lawyer; that Detective Domenic applied no physical or psychological pressure on Appellant; that Appellant did not appear to be under the influence of drugs or alcohol; that Appellant was attentive and "looking at" Detective Domenic while being advised of his ***Miranda*** rights; and that Appellant was cooperative, responsive, and "very willing" to answer questions. Although Appellant advised the detectives that he was bipolar and received therapy and medications (including Klonopin) for his disorder, he assured [the detective] that neither his bipolar disorder nor his medications affected his ability to understand his situation or make decisions on his own behalf. According to Detective Domenic, Appellant exhibited no behavior indicating that he lacked the capacity to knowingly and voluntarily waive his ***Miranda*** rights. At the conclusion of the interview, moreover, Appellant read his entire statement and again reviewed the ***Miranda*** warnings.

Trial Court Opinion, 8/7/2018, at 4-5, *citing* N.T., 5/8/2017, at 9-26 and 41.

Following the presentation of evidence regarding suppression, the trial court ultimately concluded:

> Based on [Appellant's] verbal responses [to the police], [Appellant's] demeanor, [Appellant's] ability to answer directly and in detail, there was no testimony about [Appellant] acting in any [] way that would [constitute] bizarre [] or unusual behavior. [Appellant] seemed cooperative, and there's just no testimony or evidence that was elicited that would contradict that.
>
> So under the totality of the circumstances, and for all of the factors [] outlined, [the trial court found] that [Appellant] gave a knowing, intelligent, and voluntary waiver of his right to remain

silent [and] that the statement [to police] was voluntarily and knowingly given.

So [Appellant's suppression] motion [was] denied.

N.T., 5/8/2017, at 80-81.

Following the suppression ruling, the parties agreed to proceed immediately to a bench trial. The trial court colloquied Appellant regarding his right to a jury trial, the charges he was facing, and the maximum penalties involved. *Id.* at 88-94. Appellant waived his right to a jury trial. *Id.* at 94. The Commonwealth called Officer Saba, the investigating Philadelphia police officer, to testify. *Id.* at 97-111. The trial court held a second day of trial on May 19, 2017, wherein the victim's sister, two detectives, and a DNA expert testified. N.T., 5/19/2017, at 1-111. The Commonwealth also presented the trial court with a video surveillance recording of the incident. *Id.* at 103-110. The trial court rendered a verdict on May 22, 2017, finding Appellant guilty of the aforementioned charges.

On August 21, 2017, the trial court held a sentencing hearing. The trial court sentenced Appellant to 13 to 26 years of imprisonment for attempted murder. The trial court further sentenced Appellant to a 10-year consecutive term of probation for robbery. The convictions for aggravated assault and theft by unlawful taking merged for sentencing purposes. Defense counsel advised Appellant of his appellate rights. Thereafter, upon Appellant's

request, the trial court allowed counsel to withdraw.[3]  This timely appeal

resulted.[4]

_____

[3]    Before allowing Appellant to proceed *pro se*, the trial court colloquied Appellant, with applicable questions pursuant to Pa.R.Crim.P. 121, to ensure that his waiver of the right to counsel was knowing, intelligent and voluntary. N.T., 8/21/2017, at 30-33.  Appellant was told that he had the right to counsel, that he would be bound by rules of court, including the specifically delineated timing deadlines for filing post-sentence motions and a notice of appeal, that he could permanently lose his rights if he failed to assert them in a timely fashion, and that counsel would be familiar with the rules.  ***Id.***

[4]   Appellant did not file *pro se* post-sentence motions, but filed a *pro se* notice of appeal on August 31, 2017.  Although the filing date of Appellant's subsequent *pro se* request for counsel is not entirely clear from the record, the trial court entered an order on September 27, 2017 appointing Lee Mandel, Esquire as counsel to represent Appellant on appeal.  On January 18, 2018, the trial court directed Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Attorney Mandel complied on behalf of Appellant on February 2, 2018. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on August 7, 2018.

Additionally, we note that while represented by counsel, Appellant inundated the trial court and this Court with a multitude of *pro se* filings and correspondence.  Most notably, on November 20, 2017, Appellant filed a "Motion of New Counsel" with this Court requesting, once again, to proceed *pro se*.  On December 13, 2017, this Court entered an order directing the trial court to conduct an on-the-record waiver of counsel determination pursuant to ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998).   Before the trial court could conduct a ***Grazier*** hearing, however, Appellant filed another *pro se* motion with this Court on February 8, 2019, seeking the appointment of counsel. The trial court held a ***Grazier*** hearing on March 12, 2018.  At the conclusion of the hearing, the trial court permitted Appellant to proceed *pro se* and allowed Attorney Mandell to withdraw.  ***See*** N.T., 3/12/2018, at 9-10. On the same day as the ***Grazier*** hearing, this Court entered an order granting Appellant's February 8, 2019 request for the appointment of counsel.  As such, on March 18, the trial court appointed John Belli, Esquire to represent Appellant on appeal.  On May 7, 2019, Attorney Belli filed an appellate brief with this Court on behalf of Appellant.  Appellant has not objected.  Thus, we will no longer allow Appellant to proceed *pro se* on appeal. While  it  is  true

On appeal, Appellant presents the following issues for our review:

1. Did the [trial] court err by denying Appellant's motion to suppress his statement [to police]?

2. Was the evidence insufficient to sustain [Appellant's] attempted murder conviction?

3. Was the evidence insufficient to sustain [Appellant's] robbery conviction?

Appellant's Brief at 3[5] (complete capitalization omitted; issue numbers supplied).

_____

that an "appellant has the right to proceed *pro se* at trial and through appellate proceedings[,]" our Supreme Court has determined "that when an appellant requests *pro se* status after his counsel has filed an appellate brief, the request is untimely." *Commonwealth v. Grazier*, 713 A.2d 81, 82 (Pa. 1998); *see also Commonwealth v. Rogers*, 645 A.2d 223, 224 (Pa. 1994) ("Allowing [an appellant] to terminate counsel and proceed *pro se* on amended and supplemented briefs would [] result in confusion and overburdening of the court[.] [Our Supreme Court,] therefore [found] that it [was] appropriate to prohibit such a tactic and to require an appellant to remain with counsel through the appeal, once counsel has filed briefs.").

Finally, we note that during the pendency of this direct appeal, on April 10, 2018, Appellant filed a *pro se* petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. On July 17, 2018, the PCRA petition was denied. On August 10, 2018, Appellant filed a *pro se* notice of appeal that was docketed with this Court at 2512 EDA 2018. However, because Appellant filed his *pro se* PCRA petition during the pendency of his direct appeal, we are constrained to quash the appeal at 2512 EDA 2018. *See Commonwealth v. Leslie*, 757 A.2d 984, 985 (Pa. Super. 2000) ("A PCRA petition may only be filed after an appellant has waived or exhausted his direct appeal rights.").

[5] We have reordered Appellant's issues for clarity and ease of discussion.

In the first issue we review, Appellant claims that the trial court erred by denying suppression because he "established that he suffered from mental illness and intellectual deficits that rendered him incapable of voluntarily and intelligently waiving his *Miranda* rights" before he made statements to the police. Appellant's Brief at 17. More specifically, Appellant contends that the following factors, when considered together, rendered his waiver of *Miranda* rights and his statements to the police involuntary:

- Appellant's IQ of 69.

- Appellant suffered from depression, bi-polar disorder, schizoaffective disorder, schizophrenia, personality disorders, substance abuse, and mild mental retardation.

- [A]ppellant was not asked what he thought the right to remain silent or have counsel meant.

- Appellant was placed in an isolated room and handcuffed to a chair.[6]

- [A]lthough [A]ppellant said he had a mental illness during the interview, he was not asked when he last took his medication or underwent therapy or counseling for his various mental illnesses.

---

[6] While Appellant currently suggests that his waiver of *Miranda* rights was the product of police coercion or undue government pressure, he did not raise this contention in his Rule 1925(b) statement. In that statement, Appellant merely asserted that his mental illness, diagnosed as mild mental retardation, prevented him from understanding his *Miranda* rights. *See* Pa.R.A.P. 1925(b), 2/7/ 2018, at ¶ 1. Generally, issues not raised in a concise statement of errors complained of on appeal are waived for purposes of appellate review. *See* Pa.R.A.P. 1925(b)(4)(vii); *see also* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *see also Commonwealth v. Cline*, 117 A.3d 922, 927 (Pa. Super. 2017) ("A new and different theory of relief may not be successfully advanced for the first time on appeal."). As such, we will not entertain Appellant's suggestion that his waiver of *Miranda* rights was coerced or subject to police pressure.

*Id.* at 23 (record citations omitted).

We adhere to the following standard:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record.... Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

*Commonwealth v. Cephus*, 208 A.3d 1096, 1098 (Pa. Super. 2019)

(internal citations omitted).

This Court recently stated:

When determining the validity of a *Miranda* waiver, we employ a two-step inquiry. We first ask whether the waiver was voluntary in the sense of being the result of an intentional choice on the part of a defendant who was not subject to undue government pressure. *Commonwealth v. Mitchell*, 105 A.3d 1257, 1268 (Pa. 2014) (*citing Commonwealth v. Logan*, 549 A.2d 531, 537 (Pa. 1988) (opinion announcing the judgment of the Court)). If we conclude the waiver was voluntary, we then ask if the defendant was aware of the nature of the choice that he made by giving up his *Miranda* rights, *i.e.*, whether it was knowing and intelligent.[7] *Id.*

\*          \*          \*

---

[7]   Here, as mentioned previously, Appellant waived his challenge to the voluntariness of his statement to police. Thus, we need only consider whether his statement was knowing and intelligent.

- 9 -

The burden is on the Commonwealth to prove by a preponderance of the evidence that a **Miranda** waiver was knowing and intelligent. **See Commonwealth v. Lukach**, 163 A.3d 1003, 1011 (Pa. Super. 2017). There is no *per se* rule that a defendant is incapable of knowingly and intelligently waiving his rights whenever he asserts a mental disability. **See Commonwealth v. Sepulveda**, 55 A.3d 1108, 1136 (Pa. 2012) (*citing* **Logan**, 549 A.2d at 537).

Our Supreme Court's decision in **Logan** is instructive. In **Logan**, the Court concluded that regardless of the appellant's mental illness, the circumstances surrounding his confession showed that the waiver was "the product of a free, unconstrained, and rational choice of its maker." **Logan**, 549 A.2d at 537. The circumstances in **Logan** included that Logan was advised of his **Miranda** rights twice, he gave a full statement, which he reviewed and signed, and there was no evidence of police coercion. **Id.** at 536-537. Logan was able to do all of this even though he had a mental illness.

**Commonwealth v. Knox**, 2019 WL 4316128, at *3 (Pa. Super. filed September 12, 2019).

In denying suppression in the case *sub judice*, the trial court concluded:

Here, the testimony of Detective Domenic, and the report of Appellant's own medical expert, demonstrate that Appellant was sufficiently competent to waive his **Miranda** rights. Detective Domenic interviewed Appellant and testified that Appellant was cooperative and 'very willing' to give the interview. Appellant did not appear to be under the influence of drugs or alcohol, and Detective Domenic applied no physical or psychological pressure to induce Appellant's statement. Moreover, Appellant assured Detective Domenic that neither his bipolar disorder nor his medications affected his ability to understand his situation or make decisions on his own behalf. Appellant's overall behavior gave no indication that he lacked the capacity to knowingly and voluntarily waive his **Miranda** rights.

Detective Domenic's testimony is corroborated by Appellant's statement itself, which Appellant read and signed. The verbatim statement confirms that Appellant voluntarily gave the interview, that he understood why he was in custody, that he was advised of his rights to counsel, that he was not under the influence of

- 10 -

drugs or alcohol, and that he was capable of making decisions for himself.

Beyond that, Appellant's expert, Dr. Blair, noted that Appellant demonstrated ample ability to comprehend his legal situation. Dr. Blair noted that during her evaluation, Appellant's presentation did not suggest significant cognitive impairment. To the contrary, Appellant was able to articulate his thoughts clearly and process clearly and respond appropriately.

Trial Court Opinion, 8/7/2018, at 9-10 (record citations and quotations omitted).

Based upon our standard of review and the record before us, we discern no trial court error in denying Appellant's motion for suppression. We reject Appellant's challenge to the trial court's ruling based solely on his I.Q. Our Supreme Court has held there is no *per se* rule that a defendant is incapable of knowingly and intelligently waiving his ***Miranda*** rights whenever he asserts a mental disability. ***See Sepulveda***, 55 A.3d at 1136. Here, the circumstances surrounding Appellant's confession show that his waiver was the product of a free, unconstrained, and rational choice. Similar to our Supreme Court's decision in ***Logan***, in this case, police advised Appellant twice of his ***Miranda*** rights, he gave a statement that he reviewed and signed, and there is no evidence that his mental illness prevented him from knowingly waiving his rights. As such, Appellant's claim that the trial court erred in denying suppression lacks merit.

In his next two issues, Appellant claims that the Commonwealth failed to produce sufficient evidence to support his convictions for attempted murder and robbery, respectively. Whether evidence is sufficient to support a

- 11 -

conviction presents this Court with a question of law and, thus, our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 300 (Pa. Super. 2019) (citation omitted). This Court examines:

> whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, is sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.

***Id.*** at 300–301.

With regard to his attempted murder conviction, Appellant contends that he could not form the specific intent to kill because he has "an I.Q. of 69 and suffered from many mental illnesses." Appellant's Brief at 13. Moreover, Appellant argues that "his actions were not deliberate or well-reasoned and stemmed from rage and anger caused by the fact that the victim was not a woman[,] but a man." ***Id.*** As such, Appellant contends that, "it is clear that he snapped and lost control of his faculties rather than coldly and calculatingly deciding to kill the victim." ***Id.***

We have stated:

Under the Crimes Code, "[a] person commits an attempt when with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of the crime." 18 Pa.C.S.A. § 901(a). "A person may be convicted of attempted murder 'if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act.'" *Commonwealth v. Dale*, 836 A.2d 150, 152 (Pa. Super. 2003) (citation omitted). *See* 18 Pa.C.S.A. §§ 901, 2502. "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *Commonwealth v. Gilliam*, 417 A.2d 1203, 1205 (Pa. Super. 1980). "The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence." *Commonwealth v. Schoff*, 911 A.2d 147, 160 (Pa. Super. 2006). "[T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts[.]" *Commonwealth v. Gease*, 696 A.2d 130, 133 (Pa. 1997).

*Commonwealth v. Jackson*, 955 A.2d 441, 444 (Pa. Super. 2008).

Moreover, we recognize that the "law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second." *Commonwealth v. Clemons*, 200 A.3d 441, 463 (Pa. 2019) (citation omitted).

In this case, the trial court determined:

Here, the Commonwealth's video shows that Appellant repeatedly punched and kicked the victim in the head while she struggled to rise from the ground and escape. After enduring multiple strikes, the victim finally lost consciousness and laid motionless on the concrete. While [the victim] was unconscious, motionless, and defenseless, Appellant violently stomped on her head several times. Appellant was not acting in self-defense and had already beaten the victim into bloody unconsciousness by the time that he **repeatedly** bludgeoned her head with his foot. These acts themselves – *i.e.*, Appellant's vicious pounding on the head of the unconscious victim – establish a compelling inference that

- 13 -

> Appellant intended to kill the victim and thus sustain Appellant's conviction of attempted murder.

Trial Court Opinion, 8/7/2018, at 12 (emphasis in original).

Upon review, we agree with the trial court's assessment that there was sufficient evidence to support Appellant's conviction for attempted murder. Initially we reject Appellant's argument there was no evidence of premeditation. Appellant concedes that "he snapped" when he recognized that the victim had male genitalia. It was in that fraction of a second that Appellant formulated an intent to kill the victim. Appellant's subsequent actions of beating the victim unconscious with his fists and then continually stomping on her head while she was defenseless on the ground showed an intent to kill the victim. The trial court properly inferred that Appellant intended the natural and probable consequences of his acts. Accordingly, we conclude there was sufficient evidence to support Appellant's attempted murder conviction.

Regarding his robbery conviction, Appellant contends that the Commonwealth failed to prove that Appellant intended to commit a theft while the assault was taking place and that the evidence established that the taking of the victim's purse was "an afterthought." *Id.* at 14. He further argues "when [A]ppellant took the purse, the victim was already unconscious and thus, the taking was not committed with force or the threat of violence." *Id.* at 16, *citing* **Commonwealth v. Jones**, 771 A.2d 796, 799 (Pa. Super. 2001).

Before examining the merits of this issue, we note that Appellant provided a different legal theory to the trial court in support of his contention that his robbery conviction lacked sufficient evidentiary support. In his Rule 1925(b) statement, Appellant asserted:

> The trial court erred in finding [] Appellant guilty of robbery in that the [Commonwealth] failed to establish the existence of a specific complainant (victim). Further, the [Commonwealth] failed to introduce any evidence as to the existence of the subject of the theft requisite to the proof required to establish that a robbery had occurred.

Rule 1925(b) Statement, 2/7/2018, at ¶ 3. In response, the trial court recognized that although the victim did not testify because her head injuries prevented her from doing do, the video surveillance and testimony from Officer Saba and the victim's sister established the victim's identity and proved it "was the same person shown being mercilessly beaten in the video and referenced by Appellant in his confession." Trial Court Opinion, 8/7/2018, at 13. Moreover, the trial court noted that it saw, on the video surveillance, the victim carrying her purse prior to the attack and Appellant reaching down, taking a dark colored item from the vicinity and leaving after rendering the victim unconscious. *Id.* at 14.

For the first time on appeal, Appellant asserts that because the victim was unconscious at the time her purse was taken, the taking was not committed with force or the threat of violence. Appellant has waived this aspect of his appellate claim. *See* Pa.R.A.P. 1925(b)(4)(vii); Pa.R.A.P. 302(a) *Cline*, 117 A.3d at 927.

- 15 -

Regardless, we find Appellant's sufficiency argument unavailing. Here, Appellant was charged and convicted of robbery while inflicting serious bodily injury upon the victim pursuant to 18 Pa.C.S.A. § 3701(a)(1)(i). Appellant cites inapplicable case law dealing with a different subsection of the robbery statute, 18 Pa.C.S.A. § 3701(a)(1)(v), which pertains to "physically tak[ing] or remov[ing] property from the person of another by force however slight." This subsection of the robbery statute, however, pertains to pickpockets and purse-snatchers and as we have explained:

> a taking by stealth alone is not as likely to result in injury to the victim as a taking by 'force'; for 'however slight' the force may be, the victim may be prompted by it to resist, and injury may ensue. In recognition of this possibility, § 3701(a)(1)(v) has as its special purpose that greater punishment should be inflicted on those who use 'force however slight' than on those who by resort to stealth void of the use of force.

***Commonwealth v. Williams***, 550 A.2d 579, 582 (Pa. Super. 1988). Here, Appellant completed the robbery after inflicting serious bodily injury upon the victim. This was simply not a case where a defendant preyed upon an already unconscious victim and surreptitiously took property. As such, Appellant was convicted properly under § 3701(a)(1)(i). Accordingly, his last issue, although waived, is otherwise without merit.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 11/13/2019*